Jung Ja KIM, Plaintiff,

v.

Ramon K. QUICHOCHO, Law Offices of Ramon K. Quichocho, L.L.C., a limited liability company, Frances C. Quichocho, and Karissa, L.L.C., limited liability company, and Does I through V, Defendants.

No. C 09–0046.

United States District Court, D.N. Mariana Islands.

April 20, 2010.

Colin M. Thompson, The Law Offices of
Colin M. Thompson, Robert T. Torres,

Law Office of Robert Tenorio Torres, Saipan, MP, for Plaintiff.

Michael W. Dotts, O'Connor Berman Dotts & Banes, Saipan, MP, for Defendants.

MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION TO DISMISS COUNTS 1 THROUGH 3

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND ...................................1082
    A.   Procedural Background ...............................................1082
    B.   Factual Background .................................................1083
        1.   The parties' business arrangements that Kim alleges in her
             complaint ......................................................1083
        2.   The scheme that Kim alleges in her complaint ........................1085

II.  GENERAL LEGAL STANDARDS .........................................1087
    A.   Rule 12(b)(6) Motion to Dismiss ......................................1087
    B.   Rule 9(b)'s Heightened Requirements for Pleading Fraud ...............1089

III. LEGAL ANALYSIS .....................................................1089
    A.   Preliminary Issue: the "Shotgun" Format of the Complaint ............1089
    B.   RICO ..............................................................1091
        1.   RICO claim under section 1962(b), Claim 1 .........................1091
            a.   An enterprise .............................................1091
                i.   Arguments of the parties ..............................1091
                ii.  Analysis ............................................1092
            b.   Interstate commerce .......................................1093
                i.   Arguments of the parties ..............................1093
                ii.  Analysis ............................................1093
            c.   RICO standing and injury from an interest in or control of the
                 enterprise ...............................................1094
                i.   Arguments of the parties ..............................1094
                ii.  Analysis ............................................1095
            d.   Through a pattern of racketeering activity ...................1096
                i.   Arguments of the parties ..............................1096
                ii.  Analysis ............................................1098
        2.   RICO claim under section 1962(c), Claim 2 .........................1102
            a.   To conduct or participate in conduct of enterprise ...............1102
                i.   Arguments of the parties ..............................1102
                ii.  Analysis ............................................1102
            b.   Through a pattern of racketeering activity ...................1104
        3.   RICO conspiracy claim under section 1962(d), Claim 3 ..............1104
    C.   Prejudice and Leave to Amend .......................................1104
        1.   Arguments of the parties .......................................1104
        2.   Analysis ......................................................1104

IV.  CONCLUSION .......................................................1105

## I.  INTRODUCTION AND BACKGROUND

### A.  Procedural Background

On December 18, 2009, Plaintiff Jung Ja Kim filed her complaint (docket no. 1) in this case, which contains nine claims for relief.  Kim's first claim alleges that Defendants Ramon Quichocho ("Mr. Quichocho") and Francis Quichocho ("Mrs. Quichocho") violated the Racketeer Influenced and Corrupt Organizations Act [1] ("RICO"), specifically 18 U.S.C. § 1962(b), which makes it "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b).  Kim's second claim alleges that Mr. and Mrs. Quichocho violated RICO, § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  In Kim's third, and last claim under RICO, she alleges that all of the defendants violated § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).  These three counts are at issue in the motion to dismiss currently before the court, but the court notes that Kim also alleges the following claims: Claim 4 is against Mr. Quichocho and De-fendant Law Offices of Ramon K. Quichocho, L.L.C. ("Quichocho Law Offices"), for legal malpractice resulting from professional negligence; Claim 5 is also a claim for legal malpractice against the same defendants, for their alleged breach of fiduciary duty; Claim 6 is for breach of lease agreements against Mr. and Mrs. Quichocho and Quichocho Law Offices; Claim 7 is against Mr. and Mrs. Quichocho for conversion; Claim 8 is against Mr. and Mrs. Quichocho for fraud;  and Claim 9 is against Mr. and Mrs. Quichocho for constructive trust.

On January 28, 2010, the defendants filed their Memorandum in Support of Motion to Dismiss the First, Second, and Third Claims for Relief (docket no. 5), which is what brings this case before the court.  The defendants seek to dismiss the RICO claims, with prejudice, for "fail[ing] to state a claim upon which relief can be granted," pursuant to Federal Rule of Civil Procedure 12(b)(6) and, where fraud has been alleged, Federal Rule of Civil Procedure 9(b) [2].  According to the defendants, these claims should be dismissed for numerous reasons, which will be discussed in detail below.  The defendants concede that there are arguable causes of action for malpractice, breach of lease, and conversion, assuming *arguendo* that what Kim has alleged is true.  However, the defendants allege the same is not true for the RICO claims.

On March 22, 2010, Kim filed her Opposition to Defendants' Motion to Dismiss Racketeer Influenced Corrupt Organizations Act Claims (docket no. 10).  In her opposition brief, Kim resists dismissal of the claims.  However, if the court deter-

---

**1.**  *See* 18 U.S.C. § 1961 *et seq.*

**2.**  Rule 9(b) states, in pertinent part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).

mines that there are deficiencies in her complaint, she asks that she be allowed to amend her complaint and proceed with the case on the merits.

The defendants filed their Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss Racketeering Influenced Corrupt Organizations Act Claims (docket no. 11) on April 12, 2010.

On April 15, 2010, this court held a hearing on the defendants' motion to dismiss. Robert Torres of the Law Office of Robert Tenorio Torres in Saipan, and Colin Thompson of the Law Offices of Colin M. Thompson in Saipan, appeared on Kim's behalf—Mr. Thompson argued on Kim's behalf. Michael Dotts of O'Connor Berman Dotts & Banes, in Saipan, appeared—and argued—on behalf of the defendants. The motion was well briefed, and the briefs were of great assistance to the court. The arguments were spirited, yet concise, and both counsel were exceptionally well prepared.

## B. Factual Background

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), in turn citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold and Easement in the Cloverly Subterranean, Geological Formation,* 524 F.3d 1090, 1096 (9th Cir.2008) ("To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) ... [w]e accept all factual allegations in the complaint as true ....") (citing *Outdoor Media Group, Inc. v. City of Beaumont,* 506 F.3d 895, 899–900 (9th Cir.2007) (internal quotation marks and citation omitted)). **Based on the above standards, the court accepts the following factual background, as drawn from Kim's complaint, only for the propose of considering the defendants motion to dismiss.**

### 1. The parties' business arrangements that Kim alleges in her complaint

Kim's complaint alleges that she is a citizen of the Republic of Korea. Kim also alleges that she retained Mr. Quichocho to form limited liability companies, to be operated in the Commonwealth of the Northern Mariana Islands ("CNMI"), in or around the year 2007—Mr. Quichocho is allegedly a resident of CNMI and an attorney with Defendant Quichocho Law Offices. Mr. Quichocho allegedly charged Kim a flat rate of $650 to form each company, in addition to any costs Mr. Quichocho incurred. Mr. Quichocho and Kim also entered into an alleged agreement where Quichocho Law Offices leased spaces 203 and 204, in the Cabrera Building in San Jose Village, Saipan, from Kim, according to Kim. Quichocho Law Offices paid what Kim alleges is the below market rental rate of $400.00 per month. In exchange for the discounted rent, Mr. Quichocho and Quichocho Law Offices were to allegedly provide Kim legal assistance for labor disputes and mediations. Kim further alleges Mrs. Quichocho, through Quichocho Law Offices, and through a company known as Karissa, L.L.C., a defendant in this case, provided other services to Kim as part of the agreement, including the preparation, handling, and filing of all documents required for Kim's businesses, many of

which appear to own poker machines. The documents allegedly included employee renewals and transfer applications, business licenses and corporate reports, tobacco licenses, tax filings and payments, and all other filings necessary to operate Kim's business in CNMI.

Kim alleges that she utilized Mr. Quichocho's services pursuant to the agreement. On or around May of 2008, Kim also alleges that Mr. Quichocho agreed to represent Kim in resolving claims made by her employees. In June of the same year, Kim further alleges she retained Mr. Quichocho to provide legal advice and representation to several companies named in a lawsuit brought by Kim's former spouse. While Kim alleges Mr. Quichocho did not provide a fee agreement for his services, Mr. Quichocho did draw up a lease agreement for spaces 203 and 204. The agreement was said to be between Mr. Quichocho and B.K. Choi, Kim's brother-in-law, who was acting on behalf of Soi–In Corporation[3]. The lease allegedly required Mr. Quichocho to pay Kim $400.00 per month rent, on the fifteenth of each month, starting on November 15, 2007. The lease was set to expire on January 31, 2010, according to Kim's complaint. Mr. and Mrs. Quichocho also arranged for the renovation of spaces 201 and 202 at the top of the same building for their residence, according to Kim. Kim alleges that neither Quichocho Law Offices nor Mr. and Mrs. Quichocho paid rent as required by the leases.

Kim was involved in litigation with her former husband, B.S. Choi, and his brothers B.J. Choi and B.K. Choi. At some point, Kim had terminated and evicted the brothers from her business for failure to pay rent. Kim alleges that the scope of Mr. Quichocho's representation of Kim continued to expand as Kim became depressed in or around October of 2008.

Kim alleges that while the scope of Mr. Quichocho's representation of her expanded, the quality of work Mr. and Mrs. Quichocho performed on Kim's behalf declined. Kim's complaint alleges that Mrs. Quichocho delayed and failed to make timely corporate filings for the businesses entrusted to her by Kim. Kim further alleges that Mrs. Quichocho also became routinely late with employee social security filings and failed to submit other data to government agencies. Kim alleges that Karissa, L.L.C., also failed to submit employee data for Kosta, L.L.C.[4], to the CNMI Department of Labor, causing an employee to file and prevail in a labor case against Kosta, L.L.C., and causing Kosta, L.L.C., to be barred from hiring any more nonresident workers for a year. Kim also alleges that Mrs. Quichocho failed to timely renew tobacco and sanitation licenses for some of Kim's businesses.

Kim's complaint alleges that Mr. Quichocho's litigation strategies were also costly and ineffective, and his legal advice was inaccurate. For example, Mr. Quichocho is said to have breached the peace and became physically and verbally abusive to opposing parties when trying to regain possession of poker machines from one of Kim's former brothers-in-law. In addition, Kim alleges that Mr. Quichocho failed to settle labor complaints made by two former workers, which caused the matters to escalate. Rather than settle, Mr. Quichocho allegedly said that he would appeal any adverse decisions until he either obtained a successful ruling or the worker left the island. Kim alleges that Mr. Quichocho's failures caused the value of Kim's business interests to decline—Kim's physi-

---

3. This is presumably one of Kim's companies.

4. This is presumably another one of Kim's companies.

cal and emotional well-being also allegedly declined.

## 2. The scheme that Kim alleges in her complaint

Kim alleges that while Mr. Quichocho was helping her create new businesses, in or around April of 2008, Mrs. Quichocho offered to sell Kim a company, Tan Dingo, L.L.C. ("Tan Dingo"). Kim's complaint alleges that Tan Dingo was formed in 2006 by Mr. and Mrs. Quichocho and Joaquin Atalig, who is Mr. Quichocho's uncle. The agreement allegedly required Kim to pay $650 for Tan Dingo and required Mr. and Mrs. Quichocho and Atalig to resign from the company—Kim was supposed to own and control Tan Dingo.

Kim alleges that, even though Mr. and Mrs. Quichocho did not resign from the company, Kim began transferring property to Tan Dingo. In May of 2008, Kim allegedly transferred eight poker machines to Tan Dingo, for the below market price of $7,600, from Pacific Saipan, L.L.C., an entity she owned with her daughter, Dan Bi Choi. Kim also alleges that, not only were the machines sold at a below market price, but Kim paid for the machines. Similarly, on June 10, 2008, Kim allegedly transferred eight poker machines to Tan Dingo, for $7,600, and Kim—again—paid for the machines. On October 7, 2008, Kim allegedly authorized the sale of additional poker machines from Pacific Saipan, L.L.C., in the possession of B.K. Choi to Tan Dingo, and the complaint states that Mr. and Mrs. Quichocho did not pay for these machines.

In October of 2008, Mr. and Mrs. Quichocho are also alleged to have formed Latte Stone, L.L.C., ("Latte Stone"). Kim alleges that Mrs. Quichocho was listed as the only member, and Mr. and Mrs. Quichocho intended on using the business to take title to machines from businesses where Kim owned a controlling interest. Kim also alleges that Mr. Quichocho had counseled her that, "things are too hard to do alone" and that, in order to "protect her and her assets" from the Choi family's litigation and other lawsuits, Kim needed to form another company that did not have her name attached to it. In addition, Mr. and Mrs. Quichocho allegedly advised and convinced Kim that she needed to hide her ownership in Latte Stone, for her protection, as the Choi family would continue to cause problems if Kim's name were associated with or appeared on the company records and/or bank account. Kim alleges that, at this point, she was depressed[5] and dependent on Mr. and Mrs. Quichocho, and she followed their advice. Kim allowed Mrs. Quichocho to run Latte Stone in what Kim alleges was a trust for her benefit.

On October 26, 2008, Kim allegedly allowed Mrs. Quichocho to take possession of Tan Dingo's assets for transfer to Latte Stone—Kim alleges that Mr. and Mrs. Quichocho had represented to her that they would protect her investment interests. Kim also alleges that the assets transferred included ten poker machines, air conditioners, keys, a generator, a computer system, offices supplies, other assets, and cash. Kim further alleges that she transferred an additional nine pokers machines, collectively worth $2,700, from Soi–In to Latte Stone, on November 10, 2008. That same day, Kim allegedly transferred an additional machine, worth $300, from Tan Dingo to Latte Stone. On November 14, 2008, Kim allegedly caused ten machines to be shipped by air cargo

5. In early November of 2008, Kim was diagnosed and treated for major depressive disorders, anxiety, and panic disorders. She required medication for her symptoms related to these illnesses.

from Saipan to Rota for Latte Stone. Latte Stone did not pay for these machines, according to Kim. These machines were allegedly transferred due to a false representation that Mr. and Mrs. Quichocho would take care of her investment and transfer profits to her after payment of expenses—based on Mr. and Mrs. Quichocho's promises to remit revenues to her, Kim believed that they were acting as her trustees and for her benefit. On November 24, 2008, Mr. Quichocho allegedly took poker machines and $9,500 in cash and coins from Pacific Rota, L.L.C.[6]

Kim also alleges that she incurred other expenses in order to create Latte Stone. Approximately $80,000 in license fees, along with coin and bill contributions, signs, transportation and hotel costs, furniture and fixtures, and other improvements were contributed to Latte Stone by Kim, according to Kim's complaint. Kim allegedly purchased the materials and drinks necessary to prepare Latte Stone for operation—Latte Stone did business as Latte Poker room. Kim also alleges that she provided her debit card to purchase air transportation and pay hotel expenses for Mr. and Mrs. Quichocho for their trip to Rota, and she assigned and paid for her employees to travel to Rota. The employees she sent to Rota allegedly included her technician and sign board designer. Kim further alleges that she sent her brother to help set up the establishment. Lastly, Kim allegedly advanced taxes and paid deposit fees so that Latte Stone could operate.

Kim alleges that, in February of 2009, she requested a meeting with Mrs. Quichocho to discuss the state of Tan Dingo and Latte Stone. According to Kim's complaint, Mrs. Quichocho refused Kim's request to meet and instead demanded that all Tan Dingo documents be delivered to her care and custody. Allegedly because of this request, Kim met with Mr. Quichocho on February 24, 2009. At the meeting, Mr. Quichocho allegedly told Kim that he knew nothing about Latte Stone and could not do anything about it because it was Mrs. Quichocho's business. Kim alleges that she asked Mr. Quichocho to provide her with an accounting for Latte Stone and Tan Dingo and to restore her name to the ownership records for these companies. Kim further alleges that Mr. Quichocho flew to Rota the same day and, without Kim's knowledge or consent, fired Kim's employee and left word with the remaining worker that he or she should call the police if Kim or her worker entered Latte Stone's operations.

Kim alleges that, on or about March 4, 2009, Mr. Quichocho informed her that he would no longer act as her lawyer[7]. He also allegedly stated that Kim needed to hire a lawyer to represent her at a hearing set for the following day, March 5th. Kim alleges that, a few days later, she asked Mr. Quichocho to prepare all of the necessary substitution of counsel forms and deliver them to Kim's new attorney, Robert Torres, along with all business, personal, and litigation files belonging to Kim and her companies. Kim further alleges that she asked Mr. Quichocho to return some office furniture and equipment. According to Kim's complaint, she further requested that Mr. Quichocho intervene on her behalf with his wife and obtain the return of all

---

**6.** This is presumably another one of Kim's companies.

**7.** Kim's complaint alleges that Mr. Quichocho and she were named in a number of cases in which Mr. Quichocho had rendered legal services to Kim and Soi–In, in or around March of 2009. The cases are pending in this court. *See, e.g., Han v. Soi–In Corp,* Case No. CV08–0043; *Choi v. Jung–A Enterprises,* CV–08–0041.

corporate documents belonging to Kim and her companies—she specifically requested a status report on all matters requiring immediate attention, including the renewal dates for business and tax filings, employee papers requiring filing with the Department of Labor, and other papers to be forwarded to CNMI government agencies. Kim alleges that she asked Mr. Quichocho to forward all rental arrearages for his office and personal apartment to her attorney by March 13, 2009.

Mr. Quichocho allegedly did not immediately act on Kim's requests. Rather, Kim alleges that he delayed delivery of her files until she promised to pay for copies of all papers, including her personal and corporate papers. The furniture, rent, and other personal property Kim requested has still not been returned, according to Kim's complaint. Kim alleges that Mr. Quichocho has billed her, as President of Soi–In Corporation, for work he completed in Civil Action No. 08–0041, in the amount of $21,885.00, for his work between October 1, 2008, and March 6, 2009. On June 23, 2009, Kim, as President of Soi–In Corporation, allegedly received another notice to pay the fees in Civil Action No. 08–0041 and an additional bill for work done in Civil Action No. 08–0043, for $20,834.00.

On March 23, 2009, there was an L.L.C. meeting for Tan Dingo, according to Kim's complaint. Kim alleges that the attendees of the meeting included Atalig, Mr. and Mrs. Quichocho, Kim, and Kim's counsel Lillian Tenorio. At the meeting, Kim allegedly objected to Mr. and Mrs. Quichocho's theft of her ownership rights in the business and the profits from the business. Kim alleges that Mr. Quichocho stated that she was only a minority member [8], because she had not filed any certification of her financial contribution to Tan Dingo and that there was "confusion" about the number of shares that she had been issued. Mr. Quichocho also allegedly stated that Kim's membership had not been confirmed and claimed that he did not know whether Kim had paid the license fees and taxes on the poker machines that were transferred from Tan Dingo. Kim further alleges that Mr. Quichocho stated that he transferred his shares in Tan Dingo to his father.

Kim alleges that Latte Stone is earning approximately $30,000 monthly. Nevertheless, Mr. and Mrs. Quichocho have not distributed any funds to Kim, according to Kim's complaint.

## II. GENERAL LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss on the basis of "failure to state a claim upon which relief can be granted." [9] FED. R. CIV. P. 12(b)(6). In *Bell Atlantic*

---

8. According to Tan Dingo's Annual L.L.C. Report for the year 2008, dated March 6, 2009—filed by Mrs. Quichocho with the Department of Commerce on March 11, 2009—Atalig is a member owning 40 percent of the company, Mr. Quichocho owns 26 percent, Mrs. Quichocho owns 25 percent, and Kim owns 9 percent, "pending confirmation of contribution." Kim does not know how Mr. Quichocho obtained 26 percent of the company.

9. Effective December 1, 2007, Federal Rule of Civil Procedure 12 was "amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules." FED.R.CIV.P. 12, advisory committee's note. The advisory committee notes make it clear that the "changes are to be stylistic only." *Id.* The stylistic changes to Rule 12(b)(6) are in fact minimal, as Rule 12(b)(6) continues to authorize a motion to dismiss "for failure to state a claim upon which relief can be granted." FED.R.CIV.P. 12(b)(6). Thus, this amendment did not change the standards for a Rule 12(b)(6) motion.

**1088**

*Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court revisited the standards for determining whether factual allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, *see* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the ASSUMPTION THAT ALL THE allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not counte-

nance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic,* 550 U.S. at 555–56, 127 S.Ct. 1955 (footnote omitted); *see Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (instructing that "short and plain statement" requirement "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation."). Thus, the Ninth Circuit Court of Appeals has recognized that, "[a] complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains 'enough facts to state a claim to relief that is plausible on its face.'" *Coto Settlement v. Eisenberg,* 593 F.3d 1031, 1034 (9th Cir.2010) (quoting *Iqbal,* 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), in turn quoting *Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Ninth Circuit Court of Appeals has also stated that the court does "not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Id.* (quoting *Paulsen v. CNF, Inc.,* 559 F.3d 1061, 1071 (9th Cir.2009), in turn citing *Cedars–Sinai Med. Ctr. v. Nat'l League of Postmasters of the U.S.,* 497 F.3d 972, 975 (9th Cir.2007)); *see also Doe I v. Wal–Mart Stores, Inc.,* 572 F.3d 677, 683 (9th Cir.2009) (The court "need not accept Plaintiffs' unwarranted conclusion in reviewing a motion to dismiss.") (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, for the proposition that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do" (internal

quotation marks and alterations omitted); *Iqbal,* 129 S.Ct. at 1953, 173 L.Ed.2d 868, claiming that it held "that the pleading requirements stated in *Twombly* apply in all civil cases"; and *Adams v. Johnson,* 355 F.3d 1179, 1183 (9th Cir.2004), for the proposition that "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss").

### B. Rule 9(b)'s Heightened Requirements for Pleading Fraud

Because the defendants challenge some of Kim's fraud based claims on the ground that she has failed to plead those claims with sufficient particularity as required by Federal Rule of Civil Procedure 9(b), the court will review the standards required under Rule 9(b). Rule 9(b) provides: "Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED.R.CIV.P. 9(b). The Ninth Circuit Court of Appeals has explained:

> Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Schreiber Distrib. Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1400 (9th Cir.1986) (internal quotation marks omitted) (quoting *Bosse v. Crowell Collier & Macmillan,* 565 F.2d 602, 611 (9th Cir.1977)). "[T]he pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* at 1401; *see also Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 541 (9th Cir.1989). While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind-or scienter-of the defen-

dants may be alleged generally. *See In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1547 (9th Cir.1994) (en banc) ("We conclude that plaintiffs may aver scienter generally, just as the rule states-that is, simply by saying that scienter existed.").

*Odom v. Microsoft Corp.,* 486 F.3d 541, 553 –554 (9th Cir.2007). The Ninth Circuit Court of Appeals has "applied the particularity requirements of rule 9(b) to RICO claims." *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 541 (9th Cir.1989) (citing *Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392–93 (9th Cir.1988), in turn quoting *Schreiber Distrib.,* 806 F.2d at 1400).

### III. LEGAL ANALYSIS

### A. Preliminary Issue: the "Shotgun" Format of the Complaint

The defendants claim that Kim's complaint was an improper "shotgun" pleading. According to the defendants, "[i]ncorporating allegations wholesale into causes of action, often referred to as 'shotgun pleading,' is improper pleading." Docket no. 5. Kim claims that shotgun pleadings are not precluded, *per se.* However, she recognizes that some district courts have criticized shotgun pleadings where they fail to identify RICO predicate acts. Kim also argues that the defendants' authority, cited in support of their claim that Kim's complaint is an improper shotgun pleading, is distinguishable. The defendants did not provide additional arguments on this issue in their reply brief, and the parties did not discuss this issue at oral arguments.

The defendants primarily rely on Eleventh Circuit Court of Appeals's precedent. The court recently reiterated its position concerning shotgun pleadings:

The amended complaint is a typical shotgun pleading [10]. This court has condemned such pleadings in a series of cases stretching back at least as far as *Pelletier v. Zweifel,* 921 F.2d 1465, 1517–18 (11th Cir.1991) (describing such pleadings as "replete with factual allegations that could not possibly be material to any of the causes of action they assert"), and we do so once more here. Shotgun pleadings impede the administration of the district courts' civil dockets in countless ways. The district court, faced with a crowded docket and "whose time is constrained by the press of other business, is unable to squeeze the case down to its essentials." *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1333 (11th Cir.1998). It is therefore left to this court to sort out on appeal the meritorious issues from the unmeritorious ones, resulting in "a massive waste of judicial and private resources; moreover, 'the litigants suffer, and society loses confidence in the courts' ability to administer justice.'" *Id.* (quoting *Ebrahimi v. City of Huntsville Bd. of Educ.,* 114 F.3d 162, 165 (11th Cir.1997)).

*PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.,* 598 F.3d 802, 806 n. 4 (11th Cir.2010).

As the parties note, a district court in the Eastern District of California has also provided guidance on the use of shotgun pleadings:

> As noted by the Court in its prior order, not all incorporation of prior allegations by reference is unwarranted. It is common practice to incorporate by reference in later claims for relief various allegations made in earlier claims (typically allegations as to jurisdiction, venue, parties, sequence of events). Properly used, such incorporation promotes simple, concise pleadings. *Fontana v. Haskin,* 262 F.3d 871, 877 (9th Cir.2001). Allegations, however, which incorporate each preceding paragraph, regardless of relevancy, are not permitted. This practice has been harshly criticized as a form of "shotgun pleading" that violates Rule 8's requirement of a "short and plain statement" and interferes with the court's ability to administer justice. *Byrne v. Nezhat,* 261 F.3d 1075, 1129–1130 (11th Cir.2001). In attacking such pleading, defendant has an obligation to move for a more definitive statement. *Anderson v. District Bd. of Trustees of Cent. Florida Community College,* 77 F.3d 364, 366 (11th Cir.1996) (Under the Federal Rules of Civil Procedure, a defendant faced with a complaint which incorporates each preceding paragraph, whether relevant or not, is not expected to frame a responsive pleading. Rather, the defendant is expected to move the court, pursuant to Rule 12(e), to require the plaintiff to file a more definite statement.)

*Destfino v. Kennedy,* 2009 WL 63566, \*4 (E.D.Cal.2009).

In each of Kim's nine claims in her complaint, she incorporates the allegations of each preceding paragraph in the complaint. Although Kim states that her complaint is not a shotgun pleading, *see* docket no. 10 (Kim's heading reads, "Ms. Kim's Complaint is Not a Shotgun Pleading"), it squarely fits under the above-cited description of at least one form of shotgun

---

**10.** The court explained that the complaint, at issue in *PVC Windoors, Inc.,* was a shotgun complaint because: "Count I incorporates paragraphs one through seventy-three, and each of the nine succeeding counts incorporates all preceding counts, such that Count X amounts to an amalgamation of all counts of the complaint." *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.,* 598 F.3d 802, 806 (11th Cir.2010).

pleading. *See Destfino*, 2009 WL 63566 ("Allegations ... which incorporate each preceding paragraph, regardless of relevancy, are not permitted. This practice has been harshly criticized as a form of "shotgun pleading" that violates Rule 8's requirement of a 'short and plain statement' and interferes with the court's ability to administer justice.") (citations omitted). The consequence of the shotgun complaint in this case, is that allegations asserted in support of Kim's RICO claims are reasserted for her non-RICO claims, for example.

Kim's complaint is "replete with factual allegations that could not possibly be material to any of the causes of action they assert," *PVC Windoors, Inc.*, 598 F.3d 802, 806 (citing *Pelletier*, 921 F.2d at 1517–18), because of Kim's incorporation of every preceding factual allegation into each claim. Nevertheless, the court declines to *sua sponte* order repleader on this ground alone, or disregard the facts pled in paragraphs 18 through 84, as the defendants request. This case is before the undersigned only for the defendants' motion to dismiss the RICO claims, Claims 1 through 3, and the court finds that the shotgun form of the complaint does not prevent it from deciding this motion. Had the defendants believed they would be prejudiced in this motion by the court's consideration of the factual allegations as incorporated, they could have filed a Motion for a More Definite Statement under Rule 12(e), as *Destfino* suggests is a remedy. Notwithstanding, the court will grant Kim leave to amend her complaint and she is on notice—should she choose to file an amended complaint—of this court's, and other courts', concerns with shotgun pleadings and the possible problems this format could cause with respect to her other claims or reasserted RICO claims.

## B. RICO

Kim pleads three RICO claims in her complaint under §§ 1962(b), 1962(c), and 1962(d)—Claims 1, 2, and 3, respectively. The defendants allege that none of the claims were properly pled.

### 1. RICO claim under section 1962(b), Claim 1

Section 1962(b) states:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b); *see Guerrero v. Gates*, 110 F.Supp.2d 1287, 1292 (C.D.Cal. 2000) ("A violation of § 1962(b) requires: (1) acquisition or maintenance of (2) an interest in or control of (3) any enterprise ( [4] ) through a pattern ( [5] ) of racketeering activity") (citing *Medallion TV Enters., Inc. v. SelecTV of Cal., Inc.*, 627 F.Supp. 1290, 1292 (C.D.Cal.1986)). The defendants dispute whether Kim has successfully pled each element of her RICO claim under § 1962(b). The court will, first, analyze whether Kim has alleged an enterprise under RICO. Second, the court will determine whether the enterprise, or enterprises, sufficiently engaged in interstate commerce. Third, the court will evaluate whether Mr. or Mrs. Quichocho acquired or maintained the required interest in, or control of, the enterprise. Lastly, the court will observe whether Kim has alleged that such interest or control was gained through a pattern of racketeering activity.

#### a. An enterprise

*i. Arguments of the parties.* The defendants claim that, although Kim labels

Latte Stone and Tan Dingo "enterprises," "the [c]omplaint does not reveal if the term is intended as a general business term, or simply to define any of the [d]efendants as the RICO enterprise." Docket no. 5. Assuming Kim intended to label Latte Stone and Tan Dingo as enterprises under RICO, the defendants argue that the complaint does not clarify whether the defendants collectively make up the purported enterprise or how either one meets the statutory requirements of a RICO enterprise—the complaint allegedly does not adequately explain how all of the defendants played a role in the alleged fraudulent scheme. In addition, the defendants allege that Kim failed to specify what people or entities are part of the "enterprise," failed to define the structure of the enterprise, whether any of the defendants were the enterprise itself, and how the member was related to the racketeering activities.

Kim claims that she clearly identified Tan Dingo and Latte Stone as the entities that constitute the enterprises under § 1961(4). Docket no. 10 (citing Complaint at ¶¶ 87 & 88). According to Kim, the defendants fail to distinguish between an enterprise and the members of it—Kim does not claim that Mr. and Mrs. Quichocho form an enterprise. Rather, Kim claims that Mr. and Mrs. Quichocho are members of Tan Dingo and that Mrs. Quichocho is believed to be the only member of Latte Stone.

The defendants did not provide additional argument on this issue in their reply brief, but the defendants' counsel stressed in oral arguments that Kim has not properly identified a RICO enterprise or enterprises. Rather, counsel claimed that Kim's allegations amount to a claim that Mr. and Mrs. Quichocho stole Kim's poker machines. According to counsel, the enterprise did not commit criminal activity, as was the case in *Odom v. Microsoft*

*Corporation,* 486 F.3d 541 (9th Cir.2007)— Kim allegedly claims that Tan Dingo and Latte Stone are RICO enterprises but does not allege in what pattern of criminal activity they engaged.

Kim's counsel claimed that Tan Dingo and Latte Stone should be considered RICO enterprises. Counsel argued that the defendants acquired the enterprises through a scheme of fraud and continued to operate the enterprises due to their ability to launder the profits from the business.

■ *ii. Analysis.* RICO, § 1961, states that an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In *Odom v. Microsoft Corporation,* 486 F.3d 541 (9th Cir.2007), the Ninth Circuit Court of Appeals held that "an associated-in-fact enterprise under RICO does not require any particular organizational structure." *Odom,* 486 F.3d at 551 (citations omitted). Rather, such an enterprise could simply be "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 552 (quoting *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)); *see Newcal Industries, Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1056 (9th Cir.2008) ("We recently held in *Odom v. Microsoft Corp.,* 486 F.3d 541 (9th Cir. 2007), that RICO's enterprise element does not require the allegation or proof of any separate organizational structure."). "To establish the existence of such an enterprise, a plaintiff must provide both 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.' " *Id.* (quoting *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524). The *Odom* court was considering whether defendants Best Buy and

Microsoft, together, formed an "associated-in-fact enterprise under RICO." *See id.* at 551–553, 486 F.3d 541.

■ Kim has alleged that both Tan Dingo and Latte Stone are "enterprises" pursuant to § 1961(4). *See* Complaint at ¶¶ 87 & 88. Her complaint alleges that Tan Dingo was an L.L.C. that Mrs. Quichocho, Mr. Quichocho, and Joaquin Atalig formed in 2006. *See* Complaint at ¶ 42. Latte Stone, according to the complaint, was another L.L.C. formed by Mr. and Mrs. Quichocho. *See* Complaint at ¶ 52. In other words, Kim alleges that two "legal entities," *see* 18 U.S.C. § 1961(4) (" 'enterprise' includes any . . . legal entity"), are—separately—enterprises and that Mr. and Mrs. Quichocho are the persons who acquired or maintained an interest in the enterprises (as will be discussed in more detail below)—the defendants' confusion concerning whether the allegation was pursuant to § 1961 is unfounded. Although the defendants claim that Tan Dingo and Latte Stone are not RICO enterprises due to their alleged failure to perform racketeering activity—allegedly distinguishing them from the corporations in *Odom*—the *Odom* court was considering whether the corporations—together— were members of an "associated-in-fact enterprise," *see Odom*, 486 F.3d at 551– 553, which is not what Kim alleges. Instead, Kim alleges that Mr. and Mrs. Quichocho gained control of each entity through a pattern of racketeering activity in violation of § 1962(b), and continued to operate the enterprises through a pattern of racketeering activity in violation of § 1962(c)—Kim also alleges the other defendants conspired in violation of § 1962(d). Therefore, the court finds that Tan Dingo and Latte Stone are "enterprises" pursuant to § 1961(4), and the court will not dismiss this claim on the ground

that Kim failed to allege a RICO enterprise.

#### b. Interstate commerce

***i. Arguments of the parties.*** The defendants claim that Kim fails to allege how Tan Dingo and Latte Stone affect interstate commerce. Specifically, the defendants claim that "no allegations have been made as to what Latte Stone . . . 'purchases . . . or sells,' the dollar volume of these purchases and sales, or what Latte Stone . . . in fact does." Docket no. 5 (without citation). Similarly, the defendants claim Kim fails to provide an explanation concerning how Tan Dingo affects interstate commerce.

Kim argues that she only needs to allege a probable or potential affect on interstate commerce. The required *de minimis* effect on interstate commerce was met, according to Kim, by her allegations that interstate wires were used to remit money for taxes and license fees, a debit card was used to pay for air travel, a debit card was used to transfer the poker machines obtained through fraud to the island of Rota, and interstate wires are used to deposit earnings from the enterprises into banks. Kim claims that she has shown the requisite *de minimis* effect on interstate commerce by showing a probable or potential impact on interstate commerce.

The defendants did not provide additional argument concerning this issue in their reply brief, and the parties did not discuss the issue during oral arguments.

***ii. Analysis.*** A federal district court in the Central District of California has explained:

RICO grants jurisdiction over "any enterprise engaged in, or the activities of which affect interstate or foreign commerce," which is used for "a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO requires that the ac-

tivities of the "enterprise," not each RICO "predicate act," affect interstate commerce. *United States v. Rone,* 598 F.2d 564, 573 (9th Cir.1979). A "minimal" or *"de minimis"* effect on interstate commerce is sufficient to establish jurisdiction in a civil RICO prosecution. *United States v. Juvenile Male,* 118 F.3d 1344, 1348 (9th Cir.1997) (citing *Rone,* 598 F.2d at 573). A minimal effect on interstate commerce is demonstrated by "proof of a probable or potential impact." *Id.* at 1349.

*Aguilar v. Mega Lighting, Inc.,* 2009 WL 940941, *3 (C.D.Cal.2009).

■ Kim alleges, in her complaint, that Latte Stone and Tan Dingo engaged in, or their activities affected, interstate commerce because they purchased and utilized or resold goods that were supplied through the stream of interstate commerce. Complaint at 89. The goods at issue were poker machines, *see* ¶ 52, and this court finds that the purchasing, using, and reselling of these machines would have a "probable or potential impact" on interstate commerce. *Aguilar,* 2009 WL 940941 at *3. In addition, the shipment of poker machines, from Saipan to Rota by air cargo, for Latte Stone likely impacted interstate commerce. *See* Complaint at ¶ 60. Similarly, Latte Stone's commencement of operations required Mr. and Mrs. Quichocho and others to use air transportation to travel to Rota. *See* Complaint at ¶ 62. The complaint does not allege that Latte Stone's poker operation patrons travel from places off island—or whether only local residents use the poker room—but an operation that earns $30,000 per month, *see* Complaint at ¶ 72, likely affects interstate commerce. The court finds that Tan Dingo and Latte Stone, two companies that—at a minimum—are alleged to hold title to many poker machines, sufficiently affect interstate commerce and that Kim has ade-

quately pled that the enterprises affect interstate commerce under RICO.

### c. RICO standing and injury from an interest in or control of the enterprise

***i. Arguments of the parties.*** The defendants claim that Kim has not pled sufficient facts to establish she is a "person" under RICO. To do so, the defendants allege that Kim is required to assert that she is an individual capable of holding a legal or beneficial interest in property. However, assuming that Kim is a person under RICO, the defendants claim that she has failed to allege injury and causation. The defendants argue that a violation of § 1962(b) depends upon the defendants acquiring or maintaining an interest in or control of an enterprise. Since a civil remedy will only be provided if there is injury from the defendants' acquisition or control of the RICO enterprise, the defendants claim Kim must allege injury from the defendants' acquisition or control of a RICO enterprise. The defendants emphasize that Kim must show that the defendants' violation of RICO was the proximate cause of her injuries.

Kim claims that she is a "person" under RICO and that her complaint provides ample allegations of her ability to own property. Kim admits that she must allege the defendants' activities leading to their control or acquisition over a RICO enterprise and that the injury results from such control or acquisition. However, Kim claims that she has alleged such injury and causation. According to Kim, Mr. and Mrs. Quichocho's scheme allowed them to acquire and maintain control of Tan Dingo and Latte Stone and that Kim did not have as large an interest, or any interest, in the companies because of the scheme. In addition, the enterprises allegedly continued to operate and launder money acquired

due to the scheme, which prevented Kim from receiving the income from her investments.

In their reply brief, the defendants reiterate that Kim has not sufficiently alleged that she is a "person" under RICO. The defendants claim that the proper inquiry is whether "Kim allege[d] any factual information sufficient to demonstrate that she is capable of holding a legal or beneficial interest in any property?" Docket no. 11. The defendants simply claim that she has not alleged any such information in her complaint. The defendants also claim that Kim's allegation concerning injury and causation amount to the following arguments made in her brief: "but for the false representations made by the Quichochos and the material omissions of her lawyer, Ramon Quichocho, she would not have transferred her property to entities owned and controlled by the Quichochos," and that "because she transferred her property in reliance on the Quichochos' false promises, she lost her property and the income it generated." Docket no. 11 (citing docket no. 10). The defendants argue that these allegations do not cite specific paragraphs in the complaint, because the allegations were not made in the complaint. In addition, the defendants claim that Kim has not identified a violation of RICO with these allegations. Even if there was a violation of RICO identified, the defendants claim that the causation between the defendants' actions and Kim's alleged injury is insufficient, as Kim is required to not only show "but for" causation but also "proximate causation." Docket no. 11.

The parties did not discuss this issue during oral arguments.

### ii. Analysis.

■ Under RICO, a "'person' includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Kim has alleged that she "is a citizen of the Republic of Korea." Complaint at ¶ 6. However, Kim has also alleged that she owns property in CNMI: "Quichocho then induced Ms. Kim to lease him Space Nos. 203 and 204 of the premises located on the second floor of the Cabrera Building in San Jose Village, Saipan (the 'Sign Arts Building') *owned by Ms. Kim* to the Law Office L.L.C. at the below market rental of $400.00 monthly." Complaint at 1 (emphasis added). Kim has alleged that she is an "individual ... capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3), and the court finds that she has alleged that she is a person under RICO.

Concerning injury and causation under § 1962(b), the Ninth Circuit Court of Appeals has explained:

> In order to state a claim under § 1962(b), a plaintiff must allege that "1) the defendant's activity led to its control or acquisition over a RICO enterprise, and 2) an injury to plaintiff resulting from defendant's control or acquisition of a RICO enterprise." *Sebastian Int'l, Inc. v. Russolillo,* 186 F.Supp.2d 1055, 1068 (C.D.Cal.2000) (internal citations omitted). This pleading requirement means that in addition to alleging facts sufficient to assert standing, [the plaintiff] must allege "a specific nexus between the control of the enterprise and the racketeering activity." *Sea–Land Serv., Inc. v. Atlantic Pacific Int'l,* 57 F.Supp.2d 1048, 1055 (D.Hawai'i 1999).

*Wagh v. Metris Direct, Inc.,* 348 F.3d 1102, 1111 (9th Cir.2003) (overruled on other grounds, *see Odom v. Microsoft Corp.,* 486 F.3d 541 (9th Cir.2007)).

Kim has alleged that Mr. and Mrs. Quichocho's fraudulent scheme led to the control of Tan Dingo. Kim alleges that she was supposed to have control over Tan Dingo:

The Quichochos falsely [11] stated that Atalig would resign from the company and that she would obtain 100 percent ownership and control of Tan Dingo. In reliance on this false statement, Ms. Kim proceeded with the transaction. Ms. Kim paid $650 to the Quichochos for Tan Dingo. Tan Dingo authorized Ms. Kim as the sole signatory on the account.

Complaint at ¶ 44. Because of Kim's alleged fraudulently induced belief that she was in control of Tan Dingo, she paid over $200,000 in license fees and other contributions. *See* Complaint at ¶ 58. Inducement of Kim to make these payments plausibly allowed Mr. and Mrs. Quichocho to maintain control of Tan Dingo. *See Coto Settlement,* 593 F.3d at 1034 ("A complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains 'enough facts to state a claim to relief that is plausible on its face.'") (quoting *Iqbal,* 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), in turn quoting *Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Latte Stone was also formed as part of the alleged scheme, and Kim alleges that Mrs. Quichocho took control of Latte Stone as part of the scheme. *See* Complaint at ¶ 52 ("Mr. and Mrs. Quichocho then formed Latte Stone ... with the intention of taking title to machines owned by companies in which Ms. Kim held a controlling interest. Records filed by the company list Mrs. Quichocho as the only member."). Kim was told that she was going to be the beneficiary of Latte Stone, *see* Complaint at ¶ 59, which encouraged her to pay to set up the business. *See* Complaint at ¶ 61 ("Based on the Quichochos representations that the only way for a

Rota poker operation to operate free of any interference by the Choi's was to set up a company under the Quichochos' name, Ms. Kim paid approximately $80,000 in license fees, plus coin and bill contributions, signs, transportation and hotel costs, furniture and fixtures, and other improvements for the startup business."). It is plausible that Mrs. Quichocho was only able to acquire Latte Stone by inducing Kim to pay for and assist in its creation. *See Coto Settlement,* 593 F.3d at 1034 (citations omitted).

█ Kim alleges that she was excluded from ownership of Tan Dingo and not provided proceeds from Latte Stone. These allegations plausibly show that Kim had injuries "resulting from defendants' control or acquisition of [the] RICO enterprise[s]." *Wagh,* 348 F.3d at 1102 (quoting *Sebastian Int'l, Inc.,* 186 F.Supp.2d at 1068). Therefore, the court will not dismiss Claim 1 on the ground that Kim was not a person under RICO, did not sufficiently allege that the defendants' activity led to the control of the asserted RICO enterprises, or that she did not show that she was injured.

#### d. Through a pattern of racketeering activity

*i. Arguments of the parties.* The defendants claim that, although Kim's complaint is replete with references to a "fraudulent scheme," the actual activities Kim identifies are not criminal. The defendants identify, for example, buying airline tickets, paying for the shipment of poker machines, and paying taxes for poker machines. While conceding that the complaint references a criminal act that sounds like money laundering, the defen-

---

**11.** Kim also alleges that "[t]he Quichochos, however, did not resign as members of Tan Dingo." Complaint at ¶ 45.

dants claim that there is no reference to a criminal statute.

There is also no pattern of racketeering activity clearly alleged in the complaint, according to the defendants. The defendants recognize that Kim claims that buying airline tickets, paying for the shipment of poker machines, and paying taxes on poker machines are allegedly criminal acts, but they claim that this allegation is not clearly pled and that they have to read between the lines of the complaint. The defendants also recognize that the reference to "regularly deposited" money obtained from the poker machines might also be a second alleged pattern.

The defendants claim that Kim has not alleged the elements of money laundering under either § 1956 or § 1957. Although the defendants concede that Kim's complaint references §§ 1956, 1957, and 1952, they claim that Kim fails to allege specific dates of transactions, descriptions of the transfers of funds, the value of property or funds alleged to have been transferred, who conducted the activities, dates of relevant travel, or any facts to suggest that the defendants intended to further the illegal scheme through their actions.

Kim argues that her RICO claims are based on violations of the federal wire fraud statutes, which she alleges were pled in accordance with Federal Rule of Civil Procedure 9(b). Kim argues that her allegations regarding wire fraud include the "time, place, and context," of the communications concerning the fraudulent representations.

Kim claims that she properly alleged money laundering under § 1956. According to Kim, the proceeds from Latte Stone that have been deposited into banks are from prior acts of wire fraud, theft by deceptions, and theft of property—Kim argues that the theft crimes are felony violations under CNMI law. Kim alleges that she pled money laundering by tracking the language of § 1956 and that there is no requirement that money laundering be pled "with any degree of heightened particularity." Docket no. 10 (citing *Leung v. Law*, 387 F.Supp.2d 105, 119–20 (E.D.N.Y. 2005)). Nevertheless, Kim also claims that she has alleged that Latte Stone is earning approximately $30,000 a month and that Mr. and Mrs. Quichocho refuse to distribute the funds to her. Further, Kim argues—without specifically referencing her complaint—that the money is income from the machines that Mr. and Mrs. Quichocho stole and that they are laundering the money to conceal it from Kim. By laundering the money, Kim claims that Mr. and Mrs. Quichocho are able to maintain control of Latte Stone and deprive Kim of the income she should be receiving.

In the defendants' reply brief, they reiterate their claim that Kim has failed to allege predicate acts of racketeering activity. The defendants claim that, although Kim repeatedly uses the catch phrase "fraudulent scheme," she fails to provide a sufficiently detailed explanation of the scheme. In addition, the defendants argue that the activities allegedly performed in furtherance of the scheme, such as buying plane tickets, are not criminal. The defendants emphasize their argument that Kim's claim that "[t]he import of the allegations concerning plane tickets, shipping poker machines and paying taxes is that the defendants used the wires in furtherance of their scheme to defraud Ms. Kim of her property and income," docket no. 11 (citing docket no. 10), is flawed. First, the defendants claim that Kim's complaint must stand on its own and cannot be replead in her brief. Second, the defendants claim that her complaint does not describe the link between her actions in buying plane tickets, for example, and the alleged fraudulent scheme. Third, the defendants

argue that Kim cannot simply recite the statute, because Rule 9(b) requires that any predicate acts sounding in fraud be pled with particularity. Lastly, the defendants allege that Kim must set forth a factual basis for her allegation that the activities allegedly part of the fraudulent scheme were done knowingly.

The defendants also claim that the alleged predicate acts of money laundering cannot be pled with relaxed pleading standards. The defendants assert that Kim's allegations to the contrary are based on pre-*Twombly* and pre-*Iqbal* pleading standards in mind. In addition, the defendants argue that money laundering, in this case, sounds in fraud and is subject to Rule 9(b)'s pleading standards.

At oral arguments, the defendants' counsel claimed that Kim did not plead a pattern of racketeering activity, based fraud or money laundering, with sufficient particularity under Rule 9(b). In addition, counsel argued that Kim was unable to plead a pattern of racketeering activity, at all, because Kim is only alleging a one-time event of illegal activity.

Kim's counsel agreed that fraud allegations had to be pled with particularity. However, he claimed that he had sufficiently pled the fraud allegations and was not required to plead the money laundering allegations with particularity. He requested leave to amend his complaint, if the court believed it lacked particularity, and he asked the court to construe the complaint liberally and make inferences concerning where the money from the enterprises was going.

*ii.* **Analysis.** RICO, § 1961(5) provides that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Section 1961(1) identifies the crimes considered to be "racketeering activity," and Kim's complaint has identified two crimes under § 1961(1): wire fraud [12] and money laundering. *See* 18 U.S.C. § 1961(1) (" 'racketeering activity' means ... (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1343 (relating to wire fraud) ... section 1956 (relating to the laundering of monetary instruments)....")

■ Kim's brief first addresses her claim of wire fraud. "[A] wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Odom,* 486 F.3d at 554 (quoting *Schreiber Distributing Co.,* 806 F.2d at 1400); *see also* 18 U.S.C. § 1343. The *Odom* court discussed the extent to which a plaintiff must make a particularized showing of the wire fraud requirements under Rule 9(b):

To the degree that the first requirement—the formation of a scheme or artifice to defraud—requires a showing of the defendants' state of mind, general rather than particularized allegations are sufficient. Similarly, the third requirement—specific intent to deceive or defraud—requires only a showing of the defendants' state of mind, for which general allegations are sufficient. The only aspects of wire fraud that require partic-

---

12. Kim also alleges mail fraud in her opposition brief. *See* docket no. 10 ("The complaint alleges predicate acts of mail fraud...."). However, Kim does not allege mail fraud in her complaint and the reference to mail fraud appears to be an error.

ularized allegations are the factual circumstances of the fraud itself.

*Odom,* 486 F.3d at 554. "The requirement of specific intent under these statutes is satisfied by 'the existence of a scheme which was "reasonably calculated to deceive persons of ordinary prudence and comprehension," and this intention is shown by examining the scheme itself.'" *Schreiber Distributing Co.,* 806 F.2d at 1400 (quoting *United States v. Green,* 745 F.2d 1205, 1207 (9th Cir.1984), in turn quoting *United States v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir.)).

Kim generally alleges that Mr. and Mrs. Quichocho's actions were intended as a scheme to defraud and that they had the specific intent to deceive or defraud Kim, the first and third requirements of wire fraud:

> Beginning with the "sale["] of Tan Dingo to Ms. Kim, continuing through the creation of Latte Stone, Quichocho and his wife intentionally and deliberately created a fraudulent scheme to obtain the confidence and trust of Ms. Kim, to take advantage of her dependency on them, and to induce her to invest in and transfer hundreds of thousands of dollars in equipment and cash into two companies that Quichocho summarily took over and used to deny Ms. Kim ownership of her property and participation in the income derived therefrom.

Complaint at ¶ 92. Kim also alleges in her complaint:

> This scheme was knowingly implemented by defendants Quichocho and Mrs. Quichocho, both by their affirmative conduct in creating Tan Dingo, by inducing Ms. Kim to transfer property to these entities on the pretext that her interests would be safeguarded and that she would possess an ownership interest, and then by deliberately denying her

any interest in these companies after her property had been transferred.

Complaint at ¶ 100. Kim has generally alleged that Mr. and Mrs. Quichocho formed a scheme to defraud her, which was intended to induce Kim to invest in and transfer money to the two companies. Kim has sufficiently pled the first and third requirements.

The second requirement provides that Kim must make "particularized allegations," pursuant to Rule 9(b), concerning the "factual circumstances of the fraud itself." *Odom,* 486 F.3d at 554. The Ninth Circuit Court of Appeals has explained:

> We have interpreted Rule 9(b) to mean that the pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation. *See Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985) (citing *Miscellaneous Service Workers, Drivers & Helpers v. Philco–Ford Corp.,* 661 F.2d 776, 782 & n. 16 (9th Cir.1981)); *Bosse v. Crowell Collier and Macmillan,* 565 F.2d 602, 611 (9th Cir.1977); *see also Lewis v. Sporck,* 612 F.Supp. 1316, 1325 (N.D.Cal.1985) (allegations of mail fraud under section 1962(a)–1962(c) "must identify the time, place, and manner of each fraud plus the role of each defendant in each scheme").

*Schreiber Distributing Co.,* 806 F.2d at 1401. This heightened showing is, at least in part, intended to allow the defendant to "prepare an adequate answer from the allegations." *Odom,* 486 at 553 (citations omitted).

■ Kim makes several allegations concerning the ways in which she was induced to use wires by fraud: "To further the fraudulent scheme designed to divest Ms. Kim of her property, Quichocho and Mrs. Quichocho induced and caused Ms. Kim to

remit, by means of interstate wire transaction, funds to pay for airline tickets for their air travel to Rota, for the purpose of gaining assets for Latte Stone and to set up and monitor [its] administration and management," Complaint at ¶ 93; "To further the fraudulent scheme designed to divest Ms. Kim of her property Quichocho and Mrs. Quichocho procured airline tickets by interstate wire transactions for the purpose of traveling to Rota, to cement arrangements for Mrs. Quichocho's ownership of Latte Stone and her management of that company, and to later exclude Ms. Kim from participation," Complaint at ¶ 94; "To further the fraudulent scheme designed to divest Ms. Kim of her property Quichocho and Mrs. Quichocho induced and caused Ms. Kim to remit, by means of interstate wire, funds to ship gaming machines from Saipan to Rota, for the purpose of transferring assets to Latte Stone," Complaint at ¶ 95; "To further the fraudulent scheme designed to divest Ms. Kim of her property Quichocho and Mrs. Quichocho induced and caused Ms. Kim to remit, by means [of] interstate wire, taxes and license fees on the machines transferred to Latte Stone and Tan Dingo," Complaint at 96. Kim, in the "Corporate Hijacking" section of her Complaint, also alleges the dates on which some of the poker machines were transferred to Tan Dingo and Latte Stone. *See* Complaint at ¶¶ 46, 48, 51, 56, 57, and 60. In paragraph 60, Kim alleges: "On November 14, 2008[,] Ms. Kim caused ten machines to be shipped by air cargo from Saipan to Rota for Latte Stone to commence operations." Complaint at ¶ 60. Though Kim provides numerous factual allegations concerning the circumstances of the fraud, she fails to fulfill Rule 9(b)'s requirement that the allegations be particularized, and these allegations fall short of what is required under Rule 9(b) and Ninth Circuit Court of Appeals's precedent. *See Schreiber Distrib-*

*uting Co.*, 806 F.2d at 1401 ("We have interpreted Rule 9(b) to mean that the pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation.") (citations omitted); *Odom*, 486 F.3d at 554 ("The only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself.")

Although Kim alleges that she was induced to use a wire several times in her complaint, she fails to state even an approximate time when she was either induced to use a wire or actually used one— the one instance that she does specify a date on which a gaming machine was shipped, she fails to state how a wire was involved in the shipping. She does specify in paragraph 95 that *funds* were used to ship gaming machines from Saipan to Rota, *see* Complaint at ¶ 95, and in paragraph 60 claims that ten machines were shipped on November 14, 2008, but she fails to allege that a wire was used for those particular machines to be shipped. *See* Complaint at ¶ 60. For her remaining allegations, Kim does not include even an approximate time at which she was induced to use a wire or actually used a wire.

Kim also fails to allege factual circumstances concerning the place or manner in which the wire was used. Kim alleges that she was induced to use her debit card for certain purchases, but she does not allege where she made the purchases. She also alleges that she purchased air travel for other individuals but does not allege what business or other entity she paid for the air travel. If Kim made these payments, she should have this information and be able to allege it.

Kim also provides few details about how she was actually induced to use the wires on any occasion. Kim claims that she was told that she would have ownership in Tan

Dingo and be the beneficiary of Latte Stone, but she does not describe how that further induced her to buy plane tickets and provide other personal funds for the companies. Although the use of a wire in these instances is consistent with Kim's claim that she believed she owned the companies or was some type of beneficiary of them, she fails to explain how her belief about ownership led her to use private money to make these expenditures. For these reasons, the court finds that wire fraud was not properly pled as a predicate act of racketeering activity, as Rule 9(b)'s heightened particularity requirement was not met. *See* FED.R.CIV.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.")

Kim also argues that her complaint alleges money laundering under 18 U.S.C. § 1956(a)(1), as a predicate act of racketeering under RICO. Section 1956(a)(1) provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—(A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or (B) knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law[;] shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment

for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

18 U.S.C. § 1956(a)(1); *see also United States v. Marbella*, 73 F.3d 1508, 1514 (9th Cir.1996) (explaining that the elements for money laundering under § 1956(a)(1) are met if a person: "(1) engaged in a financial transaction which involved proceeds from specified illegal activity, (2) knew the proceeds were from illegal activity, and (3) intended the transaction either to promote the illegal activity or to conceal the nature, source, or ownership of the illegal proceeds.")

Kim has not alleged that the defendants had an "intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986." 18 U.S.C. § 1956(a)(1)(A)(ii). Nor has Kim alleged that the defendants were trying "to avoid a transaction reporting requirement under State or Federal law." 18 U.S.C. § 1956(a)(1)(B)(ii). As a result, Kim must have successfully alleged that the defendants had "the intent to promote the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(A)(i) or knew "that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). In either case, Kim must allege specified unlawful activity.

Kim has only alleged specified unlawful activity to the extent she asserts wire fraud. "The statute defines 'specified un-

lawful activity' by enumerating certain predicate offenses, including 'any act or activity constituting an offense listed in 18 U.S.C. § 1961.' " *United States v. Van Alstyne,* 584 F.3d 803, 810 (2009) (citing 18 U.S.C. § 1956(c)(7)); *see also* 18 U.S.C. § 1956(c)(7) ("The term 'specified unlawful activity' means ... any act or activity constituting an offense listed in section 1961(1) of this title except an act which is indictable under subchapter II of chapter 53 of title 31....."). Wire fraud, under 18 U.S.C. § 1343, is one of the listed offenses. However, theft by deception and theft of property, felony violations under CNMI law, *see* docket no. 10, n. 10, are not listed. Thus, Kim has not successfully asserted a predicate offense for the money laundering allegation.

Having not properly alleged wire fraud, money laundering, or any other specified unlawful activity under RICO, Kim has not successfully asserted a predicate act of racketeering under section 1962(b). Therefore, the court will dismiss Claim 1, unless properly amended.

### 2. RICO claim under section 1962(c), Claim 2

Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c); *see Guerrero,* 110 F.Supp.2d at 1292 ("A violation of § 1962(c) requires: (1) participation (2) in the affairs of an enterprise (3) through a pattern (4) of racketeering activity.") (citing *Medallion TV Enters., Inc.,* 627 F.Supp. at 1292). In the court's discussion of § 1962(b), it found that Kim had properly alleged the existence of enterprises under RICO: Tan Dingo and Latte Stone. The court also found that Kim had sufficiently alleged that each enterprise adequately affected interstate commerce. For the same reasons as mentioned above, the court finds that these requirements are sufficiently alleged under § 1962(c). Therefore, the court will turn to a discussion of whether Kim has adequately alleged that Mr. and Mrs. Quichocho conducted or participated in the conduct of an enterprise through a pattern of racketeering activity.

### a. To conduct or participate in conduct of enterprise

*i.* ***Arguments of the parties.*** The defendants claim that Kim's assertion that Mr. and Mrs. Quichocho directly conducted and participated in the management of Tan Dingo and Latte Stone are inadequate because the allegation simply recites the legal standard. Even if Kim's complaint sufficiently alleges that Mr. and Mrs. Quichocho exercised control, the defendants argue that the complaint does not comply with Rule 8 and Rule 9(b).

Kim does not appear to directly respond to these arguments in her brief, and the defendants do not discuss this issue in their reply brief. The parties did not discuss this issue at oral arguments.

*i.* ***Analysis.*** "*Reves [v. Ernst & Young,* 507 U.S. 170, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ] is the controlling authority on the point of what constitutes 'conduct.' " *Walter v. Drayson,* 538 F.3d 1244, 1247 (9th Cir.2008). The Ninth Circuit Court of Appeals has explained:

In *Reves v. Ernst & Young,* 507 U.S. 170, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that liability under § 1962(c), for substantive violations of the RICO statute, was lim-

ited to "those who participate in the operation or management of an enterprise through a pattern of racketeering activity." After reasoning that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs," *id.* at 179, 113 S.Ct. 1163 (quoting § 1962(c)), the Court cautioned that its adoption of the 'operation or management' test did not mean that liability was limited to upper management. "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184, 113 S.Ct. 1163; *see also id.* at 179, 113 S.Ct. 1163 ("Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs ... but some part in directing the enterprise's affairs is required.").

*United States v. Fernandez,* 388 F.3d 1199, 1228 (9th Cir.2004).

■ As the defendants recognize, Kim's complaint repeatedly asserts the legal conclusion that Mr. and Mrs. Quichocho conducted and participated in the management of Tan Dingo and Latte Stone, in paragraphs 108–111. *See* Complaint at ¶¶ 108–111. However, Kim also alleges, earlier in her complaint, that Mr. and Mrs. Quichocho had formed Tan Dingo in 2006 and represented that they "would resign from the company and that Ms. Kim would thus own and control Tan Dingo." ¶ 42. "The Quichochos, however, did not resign as members of Tan Dingo." ¶ 45. Kim also alleges Tan Dingo's March 6, 2009, Annual Limited Liability Company Report for the year of 2008, stated that Mr. Quichocho was a member owning 26 percent of the company and Ms. Quichocho was a member owning 25 percent. *See* Complaint at

¶ 75. Kim alleges that she attended an L.L.C. meeting for Tan Dingo on March 23, 2009, where Mr. Quichocho claimed to have transferred his shares to his father. *See* Complaint at ¶ 76. Nevertheless, Kim appears to question whether the transfer occurred and alleges that she was never notified of the transfer. *See id.* ("If the transfer in fact occurred and if the Ramon Quichocho referenced in Tan Dingo's 2008 annual filing is Ramon DLG Quichocho, Ms. Kim has no idea how he ended up as a member of Tan Dingo or why he ended up with twenty six percent of the company, since she was never consulted about or notified of the transfer."). Thus, Kim appears to allege that Mr. and Mrs. Quichocho own 51 percent of Tan Dingo and it is plausible that they have control over the enterprise. *See Coto Settlement,* 593 F.3d at 1034 ("A complaint may survive a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains 'enough facts to state a claim to relief that is plausible on its face.'") (quoting *Iqbal,* 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), in turn quoting *Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Concerning Latte Stone, the complaint states that "[r]ecords filed by the company list Mrs. Quichocho as the only member." Complaint at ¶ 52. Yet, Kim alleges that "... [Mr.] Quichocho flew to Rota ..., fired Ms. Kim's employee and left word with the remaining worker that if Ms. Kim and/or her worker entered the premises on which Latte Stone was operating, to call the police." Complaint at ¶ 71. Kim alleges that Mr. and Mrs. Quichocho conducted and participated in the management of Tan Dingo and Latte Stone, and she also supports these conclusions with factual allegations that make it plausible that they either were the owners of the companies or exercised sufficient control over them. The court will not dismiss

Count 2 on the grounds that Mr. and Mrs. Quichocho did not "participate in the operation or management" of Tan Dingo and Latte Stone. *Fernandez*, 388 F.3d at 1228 (citing *Reves*, 507 U.S. at 184, 113 S.Ct. 1163, 122 L.Ed.2d 525).

#### b.   *Through a pattern of racketeering activity*

Kim has adequately alleged that Mr. and Mrs. Quichocho participated in the operation or management of enterprises under RICO, but such actions must also be "through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). Kim's only allegations of racketeering activity are wire fraud and money laundering, as was the case with her § 1962(b) claim. For the same reasons as were stated in the court's analysis of that claim, Kim has not complied with Rule 9(b) when alleging that wire fraud was a predicate act of racketeering activity, and she has not adequately alleged money laundering due to her failure to properly assert a predicate act for the specified unlawful activity required for her money laundering claim. *See Van Alstyne*, 584 F.3d at 810 (Section 1956 "defines 'specified unlawful activity' by enumerating certain predicate offenses...."). The court will dismiss Claim 2 for failing to properly plead predicate acts of racketeering activity, *see* 18 U.S.C. § 1962(c), unless properly amended.

#### 3.   *RICO conspiracy claim under section 1962(d), Claim 3*

■ Section 1962(d) provides that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection ... (b), or (c) of this section." 18 U.S.C. § 1962(d); *see Guerrero*, 110 F.Supp.2d at 1292 ("A violation of § 1962(d) requires ... (1) an agreement, the objective of which is a substantive violation of RICO, and (2) awareness of the

essential nature and scope of the enterprise and intent to participate in it.") (citing *Howard v. America Online Inc.*, 208 F.3d 741, 751 (2000)). "Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO." *Howard*, 208 F.3d at 751 (citing *Neibel v. Trans World Assurance Co.*, 108 F.3d 1123, 1127 (9th Cir.1997)). "Even if Plaintiffs properly claimed that the defendants agreed to be a part of an enterprise, the failure to allege substantive violations precludes their claim that there was a conspiracy to violate RICO." *Id.*

In this case, the court has found that Kim did not adequately plead a substantive violation of RICO. As a result, Kim's conspiracy claim must also fail. *See id.* The court will dismiss Claim 3, unless properly amended.

#### C.   *Prejudice and Leave to Amend*

#### 1.   *Arguments of the parties*

The defendants argue that the defects in Kim's RICO claims are so pervasive that they cannot be cured by repleading. As a result, the defendants ask the court to dismiss Kim's RICO claims with prejudice.

Kim requests leave to amend her complaint, if any of her claims are found to be insufficient. According to Kim, the cases that the defendants cite do not apply to the case before the court.

The defendants did not discuss this issue in their reply brief. At oral arguments, Kim's counsel repeated his request for leave to amend his complaint, if the court found it deficient.

#### 2.   *Analysis*

■ "Fed.R.Civ.P. 15(a) provides, *inter alia*, that 'a party may amend his [or her] pleading once as a matter of course at any time before a responsive pleading is served....'" *Schreiber Distributing Co. v.*

*Serv–Well Furniture Co., Inc.,* 806 F.2d 1393, 1401 (9th Cir.1986). The Ninth Circuit Court of Appeals has explained, " '[a] motion to dismiss is not a "responsive pleading" within the meaning of the Rule. Neither the filing nor granting of such a motion before answer terminates the right to amend; an order of dismissal denying leave to amend at that stage is improper....' " *Id.* (citing *Mayes v. Leipziger,* 729 F.2d 605, 607 (9th Cir.1984), in turn quoting *Breier v. Northern California Bowling Proprietors' Association,* 316 F.2d 787, 789 (9th Cir.1963)). "If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Id.* (citing *Bonanno v. Thomas,* 309 F.2d 320, 322 (9th Cir. 1962)); *see also Moss v. U.S. Secret Service,* 572 F.3d 962, 972 (9th Cir.2009) (" 'Dismissal without leave to amend is improper unless it is clear ... that the complaint could not be saved by any amendment.' ") (quoting *Gompper v. VISX, Inc.,* 298 F.3d 893, 898 (9th Cir.2002), in turn quoting *Polich v. Burlington N., Inc.,* 942 F.2d 1467, 1472 (9th Cir.1991)). In addition, "[c]ourts are free to grant a party leave to amend whenever 'justice so requires,' Fed.R.Civ.P. 15(a)(2), and requests for leave should be granted with 'extreme liberality.' " *Moss v. U.S. Secret Service,* 572 F.3d 962, 972 (9th Cir.2009) (citing *Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir.2001), in turn quoting *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990)).

■ Kim is entitled to amend her complaint as a matter of course, as a responsive pleading has not yet been served. *See Schreiber Distributing Co.,* 806 F.2d at 1401 (citations omitted). In addition, the

court finds Kim's RICO claims are insufficient due to her failure to meet Rule 9(b)'s specificity requirement, which is a deficiency that can potentially be cured. *See Id.* ("leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency") (citations omitted). Therefore, the court will not dismiss Kim's RICO claims with prejudice but, instead, grants Kim leave to amend her RICO claims.

## IV.  CONCLUSION

For the above reasons, the court **grants** the defendants' Motion to Dismiss the First, Second, and Third Claims for Relief (docket no. 5) and grants Plaintiff Jung Ja Kim **leave to amend** Claims 1, 2, and 3 of her Complaint (docket no. 1). If Kim fails to amend her Complaint within ninety days, Counts 1, 2, and 3 of her Complaint (docket no. 1) shall be **dismissed without prejudice.**

**IT IS SO ORDERED.**